No. 33,160

W. L. CHURCHILL et al., *Appellees*, v. SERILDA M. DILL, R. O. CHURCHILL, JOHN R. CHURCHILL and WINSTON CHURCHILL, *Appellants*.

(65 P. 2d 337)

Opinion filed March 6, 1937.

*W. N. Moore*, of Phillipsburg, *W. L. Sayers* and *W. P. Sayers*, both of Hill City, for the appellants.

*W. A. Barron* and *Dan Hopson*, both of Phillipsburg, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is an appeal from an order probating a lost will. The pertinent facts disclosed by the record may be summarized as follows: The testator, George F. Churchill, a resident of Phillips county, and his wife were divorced and their property divided on May 8, 1931. Their troubles appear to have engendered intense feeling between them. They were the parents of four children, who took sides with the mother, which caused an estrangement between them and their father. After the divorce George F. Churchill owned a farm of 160 acres, where he resided for a time with his brother, W. L. Churchill, and wife, Mae Churchill. On May 24, 1931, George F. Churchill executed his will, by the terms of which he gave all of his property not necessary for the payment of his debts, his funeral expenses, and erecting a suitable monument at his grave, to his brother and sister-in-law, W. L. Churchill and Mae Churchill, share and share alike. The will was written by W. C. Whitney, then probate judge, and was properly witnessed. A carbon copy of it was made which George F. Churchill gave to Mae Churchill. After the will was executed the testator asked Judge Whitney to take the will to his office and take care of it. He was informed that there was a fee of one dollar connected with the depositing of a will in his office for safekeeping. He replied, "Well, you take it in your possession and keep it over there, and I will come in some day and pay you a dollar and take a receipt for it." This dollar never was paid, nor the receipt given for it. Judge Whitney took the will to his office, but because the fee had not been paid he made no record of it as having been left with him and did not place it with the other instruments of like kind. He did, however, place it in a locker with pigeon holes, the same as other wills, but in a different pigeon hole. It was in an envelope which he thinks was not sealed. When his term of office expired in January, 1933, he did not think to call the attention of his successor to it and he himself did nothing about it. When his successor, Judge Kelly, went into office he rearranged some of the papers in the office, and he saw an envelope with George F. Churchill's name written on it and the word "will" written with a pen. George F. Churchill was in the office at the time. Judge Kelly has no distinct recollection of giving the instrument to the testator, but it is possible that he did so. In the fall of 1934, perhaps late in October, Mae Churchill saw the will in a desk or chiffonier in

George F. Churchill's room. In April, 1935, the testator had a public sale at which he sold all his personal property except this desk or chiffonier and a few other personal .items. These were removed to the home of Clyde Young and wife, with whom the testator lived a short time until he was taken to the hospital a few weeks before his death. After his death a search was made for the will, but it could not be found. The carbon copy was offered and admitted to probate by the probate court, and on appeal to the district court the question of whether it should be admitted to probate was tried *de novo,* and it was again adjudged admitted to probate.

In this case there is no question about the copy of the will offered for probate being a duplicate of the will executed by George F. Churchill. Neither is there any question about the due execution of the will in harmony with our statutes. (G. S. 1935, 22-202.) It is not contended he lacked testamentary capacity, or that he was unduly influenced in making his will.

From the very nature of things a will does not take effect until the death of the testator, and he may change or revoke it at any time before it becomes effective. This gives rise to a presumption, where the facts disclose that a will, duly executed, was in the possession of the testator for some time immediately prior to his death and cannot be found after his death, that he did revoke the will, or that he destroyed it with the intention of revoking it. This is a presumption which may be overcome by proof. (*Barnes v. Brownlee,* 97 Kan. 517, 520, 155 Pac. 962; *Watkins v. Watkins,* 142 Miss. 210, 106 So. 753; *In re Calef,* 109 N. J. Eq. 181, 156 Atl. 475; Estate of Coolman, 112 Cal. App. 744, 297 Pac. 593; *Flanders v. White,* 142 Ore. 375, 18 P. 2d 823; 68 C. J. 992; 28 .R. C. L. 384, 386.)

To overcome this presumption the proponents of the will offered and the court received evidence of declarations or statements made by the testator shortly before his death that, "The will I made will stand," or "still stands." Several witnesses testified that he made statements of that character to them, or in their hearing, or to the effect that he was leaving his property to his brother and sister-in-law, and that he was leaving none of it to his children. There was also evidence to the effect that the estrangement between him and his children continued until his death. One of them, on being informed that he was seriously ill in the hospital, replied: "I am not interested." And while at the hospital in his last illness he stated to those caring for him: "Here I am sick and I do not have

a child that would give me a drink of water." None of his children went about him, or paid any attention to him. There was evidence also that after making the will he lived much of the time with the beneficiaries named therein, and spoke kindly of his brother and wife, and that his brother and wife were the only relatives who attended him or waited upon him during his last illness and who looked after his burial.

The principal contention of the opponents of the will, the appellants here, is that this class of evidence was incompetent and was improperly received by the court. They cite a number of authorities to the effect that declarations of a person that he had made a will, or made a will in a certain way, are incompetent to establish a will. This is largely because of the fact that the statutes provide how wills shall be made. They cite other authorities to the effect that declarations of a testator who had made a will, to the effect that he had revoked the will, ordinarily are not admissible in evidence to show revocation unless made at or so near the time of some act indicating revocation of the will as to be a part of the res gestae. This is partly because of statutes pertaining to how wills may be revoked. They also cite a few cases holding that declarations of a testator who had made a will, and who had possession of it, to the effect that the will stands, or that it is the way he wants it, or that he is leaving his property in the way he disposed of it by his will, are not competent to establish a lost will when the original cannot be found after his death. Cases so holding are in the decided minority. In the great majority of cases dealing with this point such evidence was held to be proper. Indeed, it is about the only class of evidence available and the most persuasive that could be produced. In the exceptionally well-considered case of *Jackson v. Hewlett,* 114 Va. 573, 77 S. E. 518, and which reviewed at length the earlier authorities and in which the facts are similar to those in the case before us, except in that case declarations of the testator before the will was made as to how he planned to make his will and leave his property were shown, it was held declarations made by the testator shortly prior to his death, indicating his satisfaction with the will as made, were properly received and were sufficient to overcome the presumption of revocation arising from the fact that the will was retained in his possession, and could not be found after his death. In the opinion the court used the following pertinent language, which accords with our judgment:

"It is difficult to see how, in a case like this, the presumption of revocation

could be overcome except by evidence such as that here relied upon. It is impossible for the beneficiaries under the will to say what became of it; they can only assert that, whatever may have happened to it, the testator did not revoke it, and that the will was made, duly executed, and its contents clearly shown is conceded. There is not a scintilla of evidence that it was revoked, nor is there a cause suggested for revoking it. There is nothing to prevent its admission to probate as established except the presumption of revocation arising from the fact that it was last traced to the testator's possession and not found after search at his death. It must be generally the case, in such a status, that the best evidence, if not the only evidence, that can be adduced to rebut the presumption of revocation is that the testator's mind for many years contemplated a certain disposition of his property; that when he disposed of that property by will his mental attitude was precisely the same that it had been during those previous years, and that after he made such disposition his mind remained in the same state practically until his death, supplemented by the consistency of his mental attitude toward his various relatives. These are held to be proper facts and circumstances to be considered as against the presumption that such mental attitude and state of mind had changed. It would seem that the question as to whether there had been a change of mind could not be better determined than by the acts and declarations of the person whose mind is to be judged." (p. 580.)

Many other authorities dealing with some phase of the question are collected in the annotations in 34 A. L. R. 1311; 62 A. L. R. 1375, 1503; 79 A. L. R. 1493, and 95 A. L. R. 711. Some of the later cases supporting our view are: *In re Auritt's Estate,* 175 Wash. 303, 27 P. 2d 713; *In re Estate of Bernard Thomas,* 274 Mich. 10, 263 N. W. 891; *In re Estate of Laddman,* 128 Neb. 483, 259 N. W. 50; *Elder v. Methodist Ass'n,* 94 Colo. 173, 29 P. 2d 631; *Thomas v. Thompson,* 114 Fla. 833, 155 So. 321; *McClellan v. Owens,* 335 Mo. 884, 74 S. W. 2d 570.

Appellants cite some language used in the opinion in *Mooney v. Olsen,* 22 Kan. 69, and *Caeman v. Van Harke,* 33 Kan. 333, 6 Pac. 620, as tending to support their contention. What was said in those cases pertains to the questions then before the court, which are distinct from the question we have here. It is argued this evidence, even if admissible, was insufficient to sustain the findings or conclusions of the trial court to the effect that George F. Churchill had not revoked his will prior to his death, and that he had not lost or destroyed it with a view of revoking it. We have examined this evidence in the light of this contention and find the point not to be well taken. It will not be necessary to set out the evidence more in detail than we have heretofore done.

In a supplemental brief, permitted to be filed since the argument,

appellants present a question not raised in their printed brief nor in the trial court, namely, that under our statutes (G. S. 1935, §§ 22-249 to 22-253), one seeking to have a copy or duplicate of a will probated, alleging the original has been lost, must allege and prove, and the court must find, that the original will was lost after the death of the testator. Appellants contend these statutes exclude authority to probate all lost wills except those lost since the death of the testators. Even now the question has not been thoroughly briefed by counsel, and our limited time prevents us from doing so. But see Thornton on Lost Wills, §§ 17, 18. But as applied to this case the question is an academic one. There is no evidence here that the will was lost prior to the death of the testator, or that the testator had lost it, or knew it was lost. After his death it could not be found by his relatives, the beneficiaries named in the will, or others who might know something of where he kept his papers. The question tried in this case was whether the will was in existence, or in force, at the time of the death of the testator. The trial court found that it was. We find no error in the trial and determination of that question.

The judgment of the court below is affirmed.